Good morning. Good morning. I'm Mark Hanson. I'm the court-appointed attorney for defendant appellant Servillana Soriano. As the court knows, we're here appealing to evidentiary issues and their material effect on the verdict by way of an overarching sufficiency of the evidence argument. I had briefed them in the order of the false testimony of the Immigration Service Officer and then the defendant's written statement that was admitted under the Nazemian line of cases and unless the court has some particular order that it would... Could you address the written statement? Yes, Your Honor. And let me pose what concerns me about the written statement. In other words, your client is interviewed through a translator. The officer writes down what he thinks is being said, correct? Well... And then sometime later your client is confronted with what the officer's written down? That's correct. In this case... So there's a break. There's several weeks, I think, between the time. And when your client is confronted with what the officer's written down, again with a translator, she goes through that statement and purportedly adopts it and then says, no, there's a couple of things in it that are wrong. So my question is, what does it matter about whether the first translator acted it as a conduit or not? Isn't the real question here the accuracy of the statement that your client adopted by going through it and saying, I disagree, I agree, etc. Yes, Your Honor. And that's how we briefed it. Right. So we don't need to worry about whether the first translator was a conduit. I don't believe that we need to even worry necessarily the second... Okay. So that's what... Thank you. Because that's what troubles me. So what's the problem with the statement that your client adopts, then, if we're not worried about whether the second translator is accurately reading it to her? It's this process that in the briefing I call the I-Fang-Yi process that's being employed in our district now in almost every case. And in our district in particular, we have a lot of... Almost everyone has English as a second language. And so there's a lot of basically is now copying the procedure that was approved in this I-Fang-Yi case. It's basically a shortcut to getting a confession that the defendant doesn't fully understand and it never actually adopts. And then it shields any cross-examination. Well, I understand how in another case this might present a real problem. I'm just trying to figure out in this case, you're not contending that the translation made the second time to your client was wrong or misleading. Your client seemed to exhibit understanding of the second translation because she said, oh no, I never said that, whether she said it or not. And so I'm trying to figure out in this particular case whether this process may well lead to problems in other cases. But how did it produce a problem in this case? Well, one, it produced this statement that is purported to be the statement of Ms. Soriano. And if she hadn't adopted it, then I would think I'd have some issues with it. But she went through it and said, yes, it's indicated her assent to it. And the problem, most of it, it's factual and then it has this one paragraph at the end that basically is the, I knew it was wrong, it was wrong, whatever that is. And it has these very incriminating professions that she didn't understand. But I have the same question. If she was read out so I don't see how we could conclude that she didn't understand it. I mean, I would say understand what? Understand that what was it that she was agreeing was wrong? I mean, because that's all she's doing, right? She's just saying, if you said it was wrong, okay. Well, you can argue that. That's what lawyers are for in a trial. But if she agreed that that was a correct statement of what she had said, then you can argue the meaning, the prosecutor can argue what it means, whether it, but you haven't told us anything that was wrong there. One, she didn't say any of that, right? I think that's the first problem is she did not say any of that. So you have this initial interview where there was no testimony by the agent that he remembered her saying that specifically. If you were dealing with that, you know, we'd have a different argument. The difficulty is he reduces what he thinks she says or thinks he's told to writing, but before introducing that document, they show it to her and they have a translator with her and they go through it line by line. And she, I think the record supports the inference that she assented to the fact that portions of this or what she said, some portions weren't and she identified them. So if we're dealing with that, I'm having the same difficulty Judge Thomas is having of dealing with how the underlying practice leads to abuse. The court never actually addresses the adopted admission test. And it basically is, it's just, if it's signed, it's adopted. And I think that that shortcuts what the rules of evidence require. You're saying that she didn't understand that by signing it, she was adopting it. Is that what your argument? I don't understand. I guess I don't understand. Yeah. I think that's the case. That is like, he's telling this, this is his words, not hers. I think we need to start with the fact that this is not her written statements. It is written statement that she's agreeing to. She didn't testify, right? No. Okay. But I mean, it's not unheard of that defendants testify and they could say at the trial, I didn't say that. Or a lawyer can argue, you know, you can attack them, the method that it was taken and saying it's not reliable. And that's, that's the I-Fong-Yi problem is we can't, because what happens is the court said, well, this isn't a Zambian I-Fong-Yi, this, this procedure has been approved that we don't have anybody to cross examine. We can't cross examine. It's found to be admissible, but you have, it's, you're, are you saying you can't cross examine the officer? What I'm saying is, yes, exactly. We, we effectively cannot cross examine in this case and in other cases. Are you, can you not cross examine the officer? And try, but then he just says, whatever's in there, she's. So your real objection seems to me not to be a And that's important because if we were looking at the effect of a constitutional error, it's different than the effect of an evidentiary error. Which, in other words, if, what you're really saying is the government didn't prove sufficiently that she really had adopted this statement. Well, yes, that's, that's the fundamental argument, but the reason is because of this to confront the people who testified about her adoption, did you not? It was just to say the, the officer. He was there on the stand. Yes. But I, I don't, I, I would suggest that that's not, that's, that doesn't meet the, the ability to confront if all he does is say, look at the written statement. I don't, I don't. I know you want the same time for a bottle, but what, what more should the government have been done to demonstrate adoption in your view? Well, I mean, there, there should be some, the court needs to be the gatekeeper of that and test the, not the Nazemian. But they can't put her on the stand. So they want to show that she's adopted this statement. You're not going to let her testify, obviously, about it. So tell me what more they need to show to show adoption. They'd have to show the reliability of the statement itself. To, to, that, that it was adopted and these, there's trustworthiness in the, the statements, not accuracy. I don't know why they went through the whole thing, is that they had an interpreter, they had two different sessions, then they went through it with her line by line, and that she adopted it. But how much time did you want to say for rebuttal? One minute. If I could just address that very briefly. It is, basically, it's an admittedly false statement. And we need to start with that. The agents in, under this procedure, embed falsities in there, but they don't catalog the false statements. So what the production, at the end, is, well, these are the things that she changed. But what, there's no, there's no, there's no disclosure of all of the things that were intentionally made false. So if, basically, by default. Well, there is, and I'm sure Judge Cameron will give you a little bit of time for rebuttal. But there is, you have the officer on the stand. He knows the false things they put in there. And he, well, I mean, he basically says, oh, she caught them all. But how do we, how do we check that? Because all of what? All of what? There are some, there are questions in there that, and that's when you say, Judge, you're the gatekeeper of this. What, where is the catalog of the falsities that were potentially embedded in there for this accuracy check? Because now we're getting in more of the scientific, I mean, and I would say that this, this is a challenge to the Nazamian line of cases also, indirectly, is we're getting into the statement itself by embedded falsities. And you need a check on that. There has to be like a, the mastermind. Yeah, and what I'm trying to figure out, and maybe you can think about this before rebuttal, is whether your position means they just can't do this at all, or there is some other evidence they should have put in to show the accuracy of the statement if it failed to do so. You don't have to answer that right away. All right, I'm going to give you two minutes for Mr. Berline. Thank you. Good morning. My name is Bruce Berline. I represent the defendant appellant. That is a long story, Your Honor. It does not. I have been trying to correct that. I am not, I am not knighted. Can I call you Mr. Berline? You certainly may. Yes. All right. I would like to reserve two minutes. I'd like to discuss two harmful errors, the admission of co-conspirator statements and the limitation on my cross-examination, and maybe if we get to it, Nazamian. Quickly, the co-conspirator statement that came in through committed perjury several times, lied to a federal agent, lied to the prosecutors, lied about an $8,000 contract in order to set everybody up to get him a T visa. He brings in co-conspirator statements of Ms. Soriano. So is it your argument that there wasn't a sufficient foundation laid to show that he was part of the conspiracy? I mean, because the fact that he's lied in the past, as I think we learned in New York a couple weeks ago, doesn't disqualify him as a witness. Yes. So why was his statement insufficient, why was the evidence insufficient to show that he was a co-conspirator? Absolutely. And I could go, I'm prepared to go through all the statements that they claim Mr. Khan said through Hosin, through... No, but I think the question, the predicate question is, was he a co-conspirator so that Mr. Khan's statements could be introduced through him? Absolutely. So tell me why there wasn't sufficient evidence to show he's a co-conspirator? That's an exception to the hearsay rule. Yes, absolutely. As opposed to Ms. Soriano's statement couldn't be admitted because you can't cross-examine Ms. Soriano. Correct. But if statements that are made as part of a conspiracy, there are certain prima facie things that have to be shown, and if those are then I think what Judge Hurwitz is saying, the fact that someone's a liar or not, that's what, you make those arguments, but that doesn't, it's, if they meet the prima facie case that they were made pursuant to the conspiracy, then they come in as an exception to the hearsay rule. Absolutely. And that's my fault for bringing that in. I didn't mean to say that's part of the test. It's that we know what the test is. It's for delay. You have to be, the government has to show there's a conspiracy, the defendant's knowledge of and participation in the alleged conspiracy, and the statement was made during and further into the conspiracy. The judge nor the prosecutor ever made that finding. The only thing that the judge made was that the statements were made during the conspiracy. She said, oh, was that statement made during the 2018 meeting? It was. It was confirmed, yes. She goes, oh, it was made during the conspiracy. It comes in, over my strenuous objection. There was no finding of a conspiracy and that Khan knowingly and willingly participated in it. Zero. So that's the big problem here, is there's been no finding. And so, okay, so let's assume quickly that that was error. We're back to, was that error harmless? That's right. That was going to be my second question. Your client's statement seems to be a lot less incriminating than Ms. Soriano's statement because it's already well established by the record that he knows Soriano. They've signed the same document. That document shows that they're trying to find a job for these three people and that he's paid, put aside the agents back and forth on what payment means and that he's paid Soriano a fee to do this. But it doesn't, there's nothing in it that establishes that he knew this was wrong or that there was something wrong in it. So even assuming the statement was improperly introduced, um, why was it, why was it prejudicial? We're, we're right. We're back to the harmless, right? Is like, okay, under our case law in Bailey, the court has to presume that has, that's error. No, if you're not dealing with a constitutional error, then we, part of your burden is not only to show error, but to show that it was prejudicial. Right. So tell me why, tell me why this statement was well, at least in the light most favorable for the government that your client had without authorization signed a document showing that these people had jobs at some place. Actually, there's very little evidence that he actually signed it. The only evidence that comes from little is enough. Yeah. Okay. But so, um, what, what I'm, what I always want to fall back on, I'm trying to answer your question, your honor, but I know you think we're supposed to show error in the constitutional area. It's your burden to show error in the constitutional area. It's the government's burden to show there's, there's not error beyond a reasonable doubt. So let's assume for a moment, you have to convince me that this was prejudicial. Tell me why it was okay. With, with the Soriano statements, this, you mean the Soriano statement? No, I mean, Mr. Khan's statement, the one that you think shouldn't have come in. I don't necessarily think. Do you think Mr. Khan's statement? The conspiracy statement. Mr. I'm sorry, I meant Mr. Khan. The co-conspirator statement. Yes, that's Ms. Soriano, right? Okay. Do that way. And then I want to get back to Khan's. That was what I was trying to ask. Okay. I mean, I think it's just her statements were basically, yeah, if I have it. Okay. Now her statements are quite damaging. So I missed, I said my question wrong. Let me ask it again. As to Mr. Khan's statement, let's assume it wasn't properly admitted. Was it really prejudicial? You're talking about the con, Mr. Khan's statement when he had the three-hour conversation with agent Jonas over the phone and that was translated. Yes. Okay. Because all he really says in that is I sent these people to Mr. Soriano to help them get visas. Yeah. And I think, I mean, frankly. Which is not really a contested matter in this case. Yeah. I don't think, I mean, it intertwines with this, what's wrong with the co-conspirator statement. Okay. Fair enough. But on its own, you don't think, there's not much to it, is there? No. In fact, I think that goes into, there's no evidence that he's involved in this conspiracy. His only statements were like, yeah, you want to renew your CW1? Go see Mr. Soriano? So now let's go back to the contract. Okay. Tell me what evidence there is that he actually signed the, somebody says he doesn't have any authority to sign that contract. So there's evidence about that. Right. What, I look, you know, I'm trying to look at the document. I'm not sure I've got it in the record, but why do you think the government didn't establish that he signed it? That's ER713. Thank you. Okay. The only person that really could say that is Ernest, is Ms. Ernest, Mary Lou, Mary Louise Ernest. She's the one that like way later from Kanoa Resort pulled him in as an employer to ask him, hey, what about this, this contract? And she specifically states or admits, I didn't, I asked him if he, if he signed it and he did not answer. Now she then asked him, did you have authorization to, to sign it? And he said, no. So there's a little bit of implication, right? Are those two enough for a judge, for a jury to find that he, that he signed a document? No, I don't think so. And more importantly, it's not enough to bring him into this conspiracy to number one, to prove the case and number two, to allow Ms. Soriano's co-conspirator statements into evidence, because you can't meet the Bordelais test. Is there a conspiracy? And the, was the defendant involved and did he knowingly and willfully participated? Those statements are out. Again, we go back to the Soriano statement doesn't come in, in your trial. That's right. And it's error. So then we're apt to, again, the burden switches to the government. What's the persuasive evidence that overcomes that to make that non-harmless? The only thing is the contract. That's all they have, Your Honor. Okay. So let's talk about the contract. The contract has a lot of problems. Number one, we don't know when the contract was ever created. Now we do have a date of a signature, right? Which is incredibly important. We don't know that he signed it, but there's a date there. And so we know that that contract must have been made before the signature. There's no evidence about who wrote the contract. More importantly, there's absolutely no evidence that Mr. Kahn knew what this purported contract was going to be used for. Absolutely none. And in fact, what we do know is that the purported contract was signed on September 30th, 2018. That's after the petition was sent and received and filed by USCIS in August of 2017. Maybe I'm wrong in my recollection of the record. So I understood that USCIS initially said we need more information. That's right. Am I wrong in thinking that this contract was sent in response to that request to USCIS? It was. It was attached. But the problem is that the purported contract was signed and assumedly made before that RFE was ever sent and received by RES. So unless Mr. Kahn could predict the future, that can't be evidence of his involvement or the conspiracy or evidence that I made this contract for the purposes of satisfying the RFE by USCIS. Because the RFE hadn't even been sent yet when this thing was signed. And the government's response to this, that's a huge timeline problem. And we made that argument in the Rule 29 motion to dismiss. And the judge is like, tell me about willfulness. How is Mr. Kahn willfully made? And the government comes in and goes, and about the timeline. And the government comes in and goes, oh, well, a reasonable juror could assume that the purported contract was the RFE, right? So they get rid of that. There's absolutely no evidence of forgeries or backdates. In fact, if it was forged, then Mr. Kahn is really off the hook. Because that means somebody came in and forged his signature. It's illogical. All right. You've gone over your time. Okay. I'll give you two minutes for rebuttal. Thank you very much. Good morning. Good morning. I may please the court. Albert Flores for the United States of America. This court should affirm the district court's rulings and convictions for both of the cases. I'm just curious, what are you required to prove? What is the government's burden and what is the defendant's burden in terms of? Because what I'm gathering from all of this, the argument, is that this is a common practice that's going on out where all of you practice. And the question is, we have Nazimian, but is what you're doing complying with that? So I'm just wondering if the facts of this case might warrant publication to say they do or they don't. So the Nazimian factors, the language conduit concept, is a threshold question for how the evidence gets admitted. First with Soriano, yes, the law was applied there by the district court judge. She issued a memorandum decision on the issue, twice doing so. Applying the Nazimian factors. And for Soriano's case in particular, it's closely analogous to the Afanyi case, which this court decided another language conduit doesn't matter. And that case was even originated from the same judge, Chief Judge Ramona Manglonia from the District of the Northern Islands. Same thing, a telephonic interpreter used, and the Nazimian factors were applied. Tell me who's, Judge Callahan asked that I'm interested to, whose burden it is to make a record as to these factors. Is it your burden to establish them in order to get the statement in, or is it the burden of the other side to raise evidence that they don't exist? Because I'm not sure what I see in this record that allows me to make those conclusions. Tell me what evidence was entered in this record that gives me some assurance that we've met the factors. Well, when the government's witness is testifying, the questions are laid for the foundation to establish those factors. But the government's witnesses in this case don't know how good a translator is on the other side. They don't speak the language. They know they've hired, they've called up somebody from the list of people that the government gives them, right? Well, sure, Judge. But the agent that is doing the interview does have some reliance on the fact that the telephonic translator service is contracted by the United States government. Okay, so that's something. Reliability there. That's something. What else does he have? Well, so then the agent speaks with the translator, and they have the interview. And in both the Soriano and Kahn cases, those two defendants both speak English. That's something else. They had the opportunity, the means to say, hey, I have a problem with the translation, something's not clear. There's three people involved in the interview. You have the defendants, or the person that's being investigated, the interviewer, the agent, and the translator. And none of these persons ever raised their hand and said, wait a minute, wait a minute, there's confusion over what's being said. The testimony from the agent actually was, I think it went quite smoothly, is the way he characterized the interview. So the agent is able to rely on the effectiveness of the translation that's being conducted. It's contracted by the government. There is never any issues raised by any of the persons involved with the interview. And the persons being interviewed speak English. So there is certainly reliability there. Are all four of the Nisman factors met in Soriano's case? Yes. Tell me what evidence goes to the fourth factor in particular. What actions did she take subsequent to the conversation that were consistent with the interpreted stand? Take into consideration how the events unfolded. So first you have an interview with Soriano on a certain date, and then a few weeks later another interview takes place. The second interview that takes place is the meeting where the agent has brought a statement that's prepared that had summarized the interview that was already given. So the interview, the confession that was already obtained, and a date prior. And then at that second meeting, that's where the was written down, and to obtain her acknowledgment, the statement was accurate. She initials in English. She makes corrections in English, identifying that there were no errors in the statement. And one of the methods... There's a translator involved in this second... That's correct. And it's a different one than the first one. That is correct, because when the agent calls this 800 number, there's a random person that's assigned, whoever the person is that's on call for this language service. So the agent doesn't know the person on the other end, and there's no evidence, there's nothing on the record that the interpreter actually participating knew any of the persons involved or had any reason to be biased whatsoever. But the actions taken subsequent to the statement, Your Honor. So is there an element that you're required to prove the translator does not have a motive to distort? Is that part of... One of the factors, one of the Nazemian factors to consider is that, that the court should assess whether or not there is a reason for the interpreter to be biased or have a reason to distort the translation. This is just a standard procedure that's used. It's with different people each time. Yes. Yes. And so... But I'm still curious about, yeah, the fourth factor. I can see how what you're saying goes to the third one, that she initials the statements, seems to go to the qualifications and language skill. I'm just unsure. So, Your Honor, I would say, again, for the Nazemian factors, you take into consideration all four factors, not one as dispositive, but just because you meet one... Right. I was going to say, maybe it doesn't matter whether... Well, I was going to say, one, it's the totality of the factors, right? Okay. Taking everything as a whole. Is it your argument that the second interview is the fourth factor? In other words, they're checking up on the accuracy of the initial statement. The problem is, it's the second statement you're introducing, not the initial one. Well, the second interview is a written statement that summarizes the first interview. So that the... But did you do... I guess to ask Judge Thomas's question a separate way, did you do anything other than what you've already described, which may be enough, I don't know, to verify the accuracy of the second statement, the one that you signed? And so, again, I would anchor on the point that none of the three persons involved in the process, the interpreter... Look, it's just maybe I'll be okay. Sometimes you get a statement and then you say, okay, let's check it out. She says she drove her car to the post office that day. We've got surveillance video. She drove her car to the post office that day. It may or may not matter. I'm just trying to find it as a matter of fact. Did you do anything to verify the accuracy of the statement that she signed? Not whether or not there's evidence that somebody acted as a conduit or didn't act as a conduit, was there any independent investigation after the second statement to... That would make a reasonable observer feel, well, that statement's got to be accurate because she said some things that we've now verified are true. The verification of the accuracy was done contemporaneously with... Okay. So the answer to my question is no. Right. It's no. There's no subsequent... It's not like she signed a statement saying I always, I don't know, drive my car someplace at noon and then afterwards she does it and we say the statement's accurate. That is fair. Okay. They didn't meet with her a third... Embedded inaccuracies? I'm sorry, Your Honor. I didn't hear you. Did the officer embed any inaccuracies? He did, yes. So that was one of the techniques that this officer chose to employ. That is a method where... What were the embedded inaccuracies and did Soriano catch them? Soriano did catch them. There were a number of things that the agent put in the statement. They were inaccurate like dates, dates of birth and small details that would make it clear to the interviewer that Soriano understood what was being, what was written down because if there was something that she did not agree with, she would correct it and she did. And the testimony of the... Okay. Tom, I don't know. I feel like I'm in an alternate world here. Isn't that evidence of whether there was an accuracy if she caught things that the officer significantly embedded as being inaccurate? Isn't that evidence of the accuracy? That is one of the factors, yes. Absolutely. Okay. Well, but you didn't say that. So I don't know why I'm saying it and you're not saying it. Yes, Judge. Soriano identified the errors and that was one of the mechanisms that the statement was effective. So while we're talking about statements, and I know there's two cases here, do the same, and it may not matter, but with respect to Mr. Kahn's statement to the investigators, what was done there to... So the process was near identical for... Well, except he, was he confronted with the statement and asked to sign it? Mr. Kahn did not sign a statement. Okay. So the agents did the same process. They had, I will say in the record, the record does not show that Mr. Kahn refused to sign. So the record does not say that, but I will say the record shows that the process was the same. Was he confronted with the translation? The record... Doesn't show that either. ...does not indicate that. You do have done a lot of things in Ms. Soriano's case to establish some reliability of the translation. In Mr. Kahn's case, I don't see any of those things. Well, the reliability... Other than the fact that you called the 800 number and got somebody who was hired by the government to translate. There's a significant difference between Kahn and Ms. Soriano regarding reliability, and that is that Mr. Kahn speaks good English. So in the record, there is testimony from Ms. Ernest. Ms. Ernest was one of the vice presidents for a company that manages a resort where Halim Kahn worked. And Ms. Ernest testified that one of the requirements to work at the Kanoa Resort, which is where Halim Kahn worked, was that Mr. Kahn had to speak English. So much so that she communicated with him via email, email in English. Halim Kahn speaks English, and so the use of the interpreter by the agent was a conservative measure by the agent just to make sure that there was no confusion. While we're talking about Mr. Kahn, could you address your friend's argument that there wasn't sufficient evidence to demonstrate that the co-conspirator, that the gentleman who testified about what Mr. Kahn said was a co-conspirator with Mr. Kahn, and Mr. Kahn was involved in the conspiracy? Sure. Well, so the appellant is challenging the admission of Farouk Hussein's testimony as it pertains to Soriano's statement. And then as it pertains to... Yes, sir. Put aside Soriano's statement. I'm talking about the testimony of the... Of Kahn. Of one of the trafficked people, of one of the employees, one of the purported employees who says this is what Kahn said during the course of the conspiracy. Well, what Kahn said was said to the agent who took the interview, and then the agent testified to the party admission of a... No, I'm not worried about what Kahn said. What is the statement that was offered, it was hearsay, and the exception was that it was made in the furtherance of the conspiracy? What statement are we talking about? That is the Farouk... That's what he's asking. Yes. That's what I was trying to clarify. That's the Farouk Hussein testimony as it pertains to Soriano's statement. Didn't a purported co-conspirator testify about what Mr. Kahn said during the conspiracy? No, Judge. No? So, Farouk Hussein testified to what Ms. Soriano stated, and Halim... Find the name and see if I... Keep going. I'll find the name. And Farouk is one of the people that was a beneficiary. He was a beneficiary. He also was a cooperating defendant. So, he was a person that was charged separately, had pled guilty. So, the statement... Name's Cedeno. ...in the furtherance of the conspiracy is what Soriano said. Yes, Your Honor. And what was the statement? In the statements by Soriano to Farouk Hussein, that was that Ms. Soriano agreed to help the beneficiary. So, there was a meeting that occurred with the beneficiaries, the three beneficiaries, and Soriano. It was a meeting that Halim Kahn had set up. Kahn introduced Soriano to the three beneficiaries. At that meeting, that's where Soriano says, okay, I will help you. This is what we need to do. You each need to pay me $900. And that Soriano also said that I need an employment certificate to include with the petition that was submitted, the fraudulent petition that was submitted. But essentially, Soriano said to Hussein, I will help, and you got to pay me. And that's the statements that were made. And in the midst of the conspiracy, this was at the meeting that took place with the planning government. It was contemporaneous with the conspiracy. Right. And Mr. Kahn's counsel says there wasn't sufficient evidence that Mr. Kahn was part of a conspiracy. So, tell me what the evidence was that Mr. Kahn was part of a conspiracy. Well, Mr. Kahn's name is on the purported contract that was submitted with the very first scenes that came in at the trial was the petition that was fraudulently submitted that is the basis of this crime. The crime being that USCIS relied on fraudulent documents, fraudulent representations with this petition. And Kahn's name is with the petition. And so, the court was correct when it pointed out earlier that the petition was by USCIS asking, hey, we need more information. Yeah. And I want to go back to what, there's not a prudent problem here because Soriano doesn't testify. But in order to get around that problem, Soriano's statements are brought in through? Hussein. Hussein. Contemporaneously. Right. So, tell me again, I've asked the question maybe in a way that doesn't get through. So, let me try it again. In order for those statements to come through, through this witness, there has to be not only evidence of a conspiracy, but evidence that this person was a co-conspirator. Soriano. Yes, Your Honor. Not just Soriano, but the person who's talking. Soriano and Hussein. Yes, you are correct. Okay. So, tell me what the evidence is that the person who's talking. Well, Hussein is one of the beneficiaries. His name is on the petition. Okay. Is that enough to show that he's a co-conspirator? You also have Hussein's admission that we went to Soriano to get help. That was the whole purpose. That's what I'm trying to find out. I'm sorry, we've missed each other. So, I'm trying to find out what evidence there was that Hussein was a co-conspirator. Right. And what evidence was there that these other two people were part of the conspiracy? The meeting, the purpose, the very purpose of the meeting was, let's put the plan together. Soriano was going to lead this thing. She's going to charge everyone money. Soriano identifies all the documents that she needs, and Soriano agrees to help. Did she say she wasn't going to really give them a job? She did indicate that, yes. So, Soriano did indicate that there was not an actual job that RES International could provide for the three beneficiaries. So, can you meet the foundational problem of showing that there was a conspiracy and that the testifying person was a member of the conspiracy through the testimony of the alleged co-conspirator? That's one way, and then also keep in mind that the trial court does have the discretion to conditionally admit the testimony with the idea that there could be more foundation laid down the road. Was there other foundation down the road? That was the testimony of Ms. Ernest and also the testimony of Special Agent Jones. And Ms. Ernest stated that she confronted Halim Khan with the contract that Ms. Ernest recognized was not authorized to be signed and that Halim Khan admitted to Ms. Ernest. Well, when Halim Khan was confronted with the contract, Halim Khan, in response, says, let me explain. Ms. Ernest, please let me explain that I wanted to help my relatives. That's what Khan says. I wanted to help my relatives. And Khan says, I recognize that I was not authorized to sign this document, but I wanted to help my brothers. So, that came in as an admission? That was testimony offered through Ms. Ernest. But it came in, it's hearsay, obviously. It is, Judge. Yeah, I guess. It came in as an admission. It did come in as an admission. Against Mr. Khan, the defendant. Yes, ma'am. Correct. So, what you're saying is that can support a conspiracy? It can, because the trial court does have a... But it was entered as an admission. Yes, Your Honor. Yes. And the trial court absolutely has a discretion to rely on testimony. But didn't do that in this case. Well, she didn't have to. Well, okay. But so, what you're really arguing is that that's icing on the cake, but there was enough before to allow the admission. That is correct. And so, not only did Ms. Verma's testimony assist that later, but also Special Agent Jonas' testimony, who testified that Haleem Khan admitted to asking Soriano for help with his family. So, I recognize that I am out of time. My colleagues have questions. I don't. I don't. Thank you. And so... Take a minute to wrap up. Well, Your Honor, I just would say that the government does ask this court to affirm the convictions of both the defendants, and the government also relies on not only the arguments made today, but also the arguments contained in the brief. I do have a question that I'll just, since I've given generous time on the other side. At the point that, let's say, that you, once you've met the Nazemian factors, is there anything out there that says then the burden shifts to the other side to show that there's something wrong? Not a shift in the burden, no. But... Do they have any burden to show that... I'm hearing all of this, but then I've never heard any evidence here that there was anything that was a misstatement. Is there anything in the record that said that there was something wrong? I think Mr. Khan's attorney seemed to think he said, well, I couldn't cross-examine the agent about this, but the agent testified to his statement. So, was he subject to cross-examination? The agent was subject to cross-examination, yes, Your Honor. Yes. Okay. I think that the argument, in summary, that you're hearing from the appellants is that there's a disagreement with the process. That's the words that was used, disagreement with the process. And this... Apparently, we're from another place than all of you are. And we had a case earlier, I think that Mr., we said, apparently, where you all come from, they take immigration violations very seriously, because these people were not on the FBI's most wanted list, but nevertheless, at a case we had earlier in the week, they tried three times for a conviction. Here, we see more dangerous people than these people, but I guess this is a big problem. There is certainly immigration challenges in our district, Your Honor, and there are some nuances and some uniqueness to the district, and immigration is certainly one of those challenges. Okay. So, thank you very much for your time. Thank you. All right. Thank you. Briefly, with my additional time, one of the problems is that it's not Nazemine. It's tangentially related, but it is the process. But there are inconsistencies in the statement with how it's being presented, and it's being misrepresented, just again, as the statements that Ms. Soriano made in March, and then signs this in April. And there are inconsistencies with what she actually said in March, and the statement in April. And if they were presenting it as an admission made in April, that would be different. But they're not. And even in oral argument, he said that these were confessions already taken, right? And that's just not the case. And there are inconsistencies. I mean, when she was interviewed in March, she didn't know the names of any of the beneficiaries. But then in April, she signs off. Can't you, okay, the way this statement, can't you call the officer and front exam the officer on all of that? No, and he testified, but he hides behind, that's what I'm saying, is he hides behind this procedure and says, well, if it's in there, she said it. But then that itself is not believable. The court is abdicating because of this I-Fang-Yi thing, which is really a Nazemian trust where the accuracy of the translation application. We're not talking about the translation at this point. We're talking about the- Because something's admitted foundationally. That is not hands-off for you as the lawyer for the person in arguing that there are problems with it, right? Well, sure, but now we're arguing to the jury something that shouldn't get in in the first place, or at the very least that the court should gatekeep. The court is abdicating the gatekeeping function to this process instead of saying, you know, if the government were being honest and came and said, and the agent said, I prepared this statement, these are my words, but she agreed to them, and this is an adopted admission, and these are all accurate, and they have been, we did corroborate these with other evidence. They're not doing that. They're using this procedure to say, well, this is the totality of what she kind of said in March. Then we investigated three more weeks or so, and we added a bunch of other stuff, and we clarified some things for her, like everything that she couldn't remember in that. Oh, and we added in there, just for the jury to hear, she thinks it's wrong, and, you know, she's sorry and she'll never do it again, right? That sort of thing. You're over on overtime, so why don't you wrap up? Okay, so, I mean, basically, it's not Nizamian, but it's the court abdicating its gatekeeping function. We'd just like, if you're honest, to look at that, look at the briefing, and see that there has never been any trustworthiness of the statements themselves, as opposed to the accuracy of the translation that is basically shortcutting the whole process. Thank you. Thank you, Your Honor. First of all, the process between Ms. Soriano and Mr. Kahn is nowhere near the same. I don't want to spend a lot of my time on Nizamian, but there's a big problem with Nizamian and Kahn. Second, But he speaks English. There's testimony that he speaks English. That's true. But the court never analyzed the Nizamian factors. None. She just accepted it, basically. Oh, he must have had the power to sit there and go, hey, that's not right. But that's not the test. Nizamian has specific factors that the court must find, does not have broad discretion under USV-Chi. USV-Chi was a case about, oh, do we need a translator in the actual trial? No, no, no. And then the court said, you got, the trial court has broad discretion to provide a translator. It doesn't have broad discretion to conduct the Nizamian factors. So that was never done. The second thing is, the government talks about a meeting that Mr. Hosen and all these guys went to with Soriano. Mr. Kahn was never there. All Mr. Kahn said, basically, is, hey, you need a CW-1? Go see Ms. Soriano. That's it. But is it Ms. Soriano's statements that you object to? Yes. It's not a statement that was attributed to Mr. Kahn, is it? Correct. I'm sorry. And I should have, that might be my fault, Your Honor. I think that's what you said before, and that's why I was a little confused. Ms. Soriano's statements came in through Mr. Hosen. And you're saying there wasn't sufficient foundation for showing that? Absolutely. Under the appropriate test in Bourgeollais. I might be mispronouncing that name, but I'm not French. We're pronouncing every other name. It seems I have every case name that I can't pronounce. But Mr. Kahn wasn't there. All this is so attenuated and not really related. But the other thing is, Mr. Kahn's name isn't with that petition. Nowhere. Mr. Kahn's name might be on that contract that was created before the RFE was sent, and then the RFE was stapled, the contract was stapled to the RFE, but there's no indication. First of all, there's nothing wrong with that contract, but there's no indication that Mr. Kahn knew. There's something wrong with the contract, because the person from the resort says whoever signed this contract had no authority to sign it. Yes, on the level of Kanoa Resort policies, sure, but again, that's so attenuated from this. There's actually a reasonable reason for that contract, because Mr. Kahn was a loyal manager of and in charge of renovation and maintenance for that hotel. He had a very small island, a very large hotel. You need to get these laborers on the side. That's what that contract was. That contract was not a contract. It was just basically like, can you hold these guys in there, because if we need them, we want to call them and bring them, and that was the problem with the cross-examination. Well, but the jury was free to find that Mr. Kahn just wanted to help people out, and he wasn't planning to do anything illegal by virtue of doing it. They could have found that, but they didn't. That's right, but did you? So they chose to believe other evidence that was presented, so that's where the rub lies. And that's a sufficiency of the evidence argument. Our main problem is finding that the conspiracy works to allow these statements in, and not only that, is the limitation on the cross-examination on a very important issue. Verma came in and said, USCIS needs a contract, and specifically, USCIS needs a valid contract. When I said, well, let's talk about a valid contract. Well, you're going completely over and over. Fair enough, Your Honor. I know that you break that. I know that you have the officer issue, so you're already over, over, so wrap up within 30 seconds. I would just encourage to look at the findings of the judge, which aren't there, for Nazemian, for the existence of a conspiracy, and to allow the Soriano statements in. You won't find any. And then take a look at the cross-examination. You won't find the appropriate foundation. It was error to admit those statements, and it was error to limit the cross-examination. Thank you very much. Thank you both for your argument. This matter will stand submitted, and this court is in recess until Friday at 9 a.m. Is this court for discussion? Yes, sir.
judges: CALLAHAN, HURWITZ, THOMAS